## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

AERO TECH, INC.,

        Plaintiff,

vs.                                          No. CIV 23-0726 JB/JHR

UNITED STATES DEPARTMENT OF THE
INTERIOR,

        Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Brief to In Support of Its
Petition for the Depositions of the Department of Interior to Proceed by Oral Examination Pursuant
to F.R.C.P. 30 and for it to Produce Certain Amendments to a Contract with Petitioner and 2023
Phone Records, filed March 29, 2024 (Doc. 18)("Motion").  The Court held a hearing on the
Motion.  Clerk's Minutes at 1, filed June 26, 2024 (Doc. 28).  The primary issues are: (i) whether
the Defendant United States Department of the Interior's response to Plaintiff Aero Tech's request
for an oral deposition, which only allows a written deposition with twenty-five questions, is
arbitrary or capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)("APA"); (ii)
whether the Interior Department must produce amendments to a 2019 contract; and (iii) whether
the Interior Department must produce telephone records from the 2023 fire season.  Because the
evidence shows an oral deposition is most appropriate here, and because the Interior Department
lacks justification for withholding documents it previously agreed to produce, the Court concludes
that the Interior Department's response is arbitrary and capricious.  The Court compels the Interior
Department to allow oral depositions, and to produce the 2021 contract amendments and the 2023
fire season telephone records.

**FACTUAL BACKGROUND**

This case involves a discovery dispute between Aero Tech and the Interior Department, who is a nonparty to the original lawsuit between Aero Tech and Great American Insurance Company.   See Aero Tech, Inc. v. Great Am. Ins. Co., No. CIV 22-00476 WJ\GJF (D.N.M.)("Great American").   The Court first sets forth the facts of the separate lawsuit to show how Aero Tech's Motion against the third-party Interior Department results.   The Court takes the following recitation of the relevant facts from Aero Tech's Complaint, filed August 29, 2023 (Doc. 1)("Complaint").   The Court does not adopt the facts as findings or truth.

1.   **Aero Tech's Lawsuit Against Great American Insurance Co.**

Aero Tech is a New Mexico-based aviation company that provides the Interior Department, its main customer, with aircraft for aerial firefighting services.   See Complaint ¶ 4, at 1.   Great American was previously Aero Tech's insurer.   See Complaint ¶ 13, at 3.   In November, 2019, Aero Tech's aircraft lost an engine and made an emergency landing in the Chilean desert.   See Complaint ¶ 18, at 3.   Great American disassembled it and denied Aero Tech's insurance claim. See Complaint ¶¶ 27-28, at 4.   In October, 2021, the parties entered into a settlement agreement requiring Great American to pay Aero Tech a sum of money and reassemble the aircraft.   See Complaint ¶¶ 33, 35, at 5.   Aero Tech alleges that Great American did not reassemble the aircraft, and further, that a tornado damaged the aircraft while it was in storage.   See Complaint ¶¶ 38,39, at 5.   Aero Tech sues Great American under breach of contract for failure to reassemble the aircraft pursuant to the Settlement Agreement, and for substantial damage to the aircraft.   See Complaint, ¶ 41, at 5.   See Great American, Complaint, filed June 28, 2022 (Doc. 1).   Aero Tech alleges

- 2 -

substantial losses from the inability to service the Interior Department with the aircraft.  <u>See</u>

Complaint ¶ 46, at 6.

> **2.    <u>Aero Tech's Discovery Request to the Interior Department in the Great American Lawsuit.</u>**

Aero Tech seeks to obtain evidence from the Interior Department -- a third-party to the

Great American Lawsuit -- to support its damages claim.  <u>See</u> Complaint ¶ 62, at 8.  In April, 2023,

Aero Tech served the Interior Department two subpoenas and a <u>Touhy</u> request.  <u>See</u> Complaint

¶ 64, at 9; <u>United States ex rel. Touhy v. Ragen</u>, 340 U.S. 462, 468 (1951)("<u>Touhy</u>").  A <u>Touhy</u>

request seeks any official information for litigation purposes, including witnesses and documents,

when the United States is not a party to the litigation.  <u>See</u> Touhy Requests, Office of the Inspector

General,  https://oig.ssa.gov/touhy-requests/  (last visited October 4, 2024).   Aero Tech seeks

discovery of documents and seeks to conduct depositions.  For the documents, Aero Tech requests

(i) copies of the Interior Department's 2019 contract and "all amendments and modifications

thereto," which show the amount of lost compensation from not servicing the aircraft to the Interior

Department, <u>see</u> Complaint ¶¶ 66, 70, at 9; and (ii) telephone records from Interior Department

employee Angie Forbes between her and Aero Tech during the 2022 and 2023 fire seasons, which

show that Aero Tech could have made revenue from servicing the aircraft.  <u>See</u> Complaint ¶ 71,

at 10.  For the depositions, Aero Tech requests: (i) the deposition of Angie Forbes, and (ii) a

witness to testify on four topics:

> (i)    [A]uthentication of the contracts (including the amendments and modifications thereto) and Phone Records;
>
> (ii)    the terms, requirements, and prices set forth in the Contracts;

(iii)    the inspections an aircraft must pass that Aero Tech seeks to use to fulfill its obligations under the Contracts (this is also known as the requirement that the aircraft be carded annually; and

(iv)    the demand for aircraft for the 2022 fire season (February to June of 2022) and for the portion of the 2023 fire season that has already occurred.

See Complaint ¶ 72, at 10.

### a.    The Interior Department's Response to Aero Tech's Discovery Request.

For the documents, the Interior Department produced: (i) the 2019 contract, and a June 1, 2022, amendment, but did not produce any other modifications or amendments, see Complaint ¶ 68, at 9; and (ii) telephone records from the 2022 fire season, but not the 2023 fire season, see Complaint ¶ 69, at 9.  For the depositions, the Interior Department replies that Angie Forbes and Angeline Clements are available to testify, but require the depositions are only written depositions with "no more than twenty-five (25) written questions, including discrete subparts."  See Complaint ¶ 73, at 10.  The Interior Department explains that it allows only written depositions because Ms. Forbes and Ms. Clements were "abnormally busy" during the 2023 fire season, working "overtime and/or additional hours."  See Response at 12-13; Respondent's Notice of Lodging Administrative Record, Administrative Record 0057 ¶¶ 10-12, lodged February 23, 2024 ("AR").  The Interior Department notes that "removing these employees from regular duties would be disruptive of mission critical work" and "would detract from their ability to perform their work for BLM."  Response at 13; Declaration of Grant Beebe ¶ 14, at 2, lodged February 23, 2024 (AR 0057-58)("Beebe Decl.").  It also notes that granting all Touhy requests "would divert employees from performing their duties and could create the appearance that the Department is taking sides in private litigation."  Response at 13, Letter from Interior Department to Robert Lakind re: Touhy

request, (dated April 27, 2023), lodged February 23, 2024 (AR 0053-54).  In allowing only a written deposition, it explains that it "is highly burdensome" for employees to take time away from work to conduct depositions and this is "especially true" for firefighting employees heading into a "very active fire season."  Response at 14, Letter from Interior Department to Robert Lakind re: <u>Touhy</u> request at 2 (AR 0054).   The Interior Department allows, therefore, only written depositions.  <u>See</u> Response at 14, Letter from Interior Department to Robert Lakind re: <u>Touhy</u> request at 2 (AR 0054).

### 3.    <u>Aero Tech's Request for Further Production of Documents and Oral Deposition in Great American.</u>

Aero Tech challenges the Interior Departments' response.  In the <u>Great American</u>, Aero Tech filed a Motion for the Deposition of the Department of the Interior to Proceed by Oral Examination Pursuant to F.R.C.P. 30, filed May 8, 2023 (Doc. 78 in CIV 22-0476 WJ\GFJ)("<u>Great American</u> Motion").  There, Aero Tech requests the Honorable Gregory J. Fouratt, United States Magistrate Judge for the District of New Mexico, to compel the Interior Department to allow an oral deposition.  <u>See</u> <u>Great American</u> Motion at 1.  Magistrate Judge Fouratt denied the motion, because according to Magistrate Judge Fouratt, a nonparty subpoena is a lawsuit "triggering the federal government's sovereign immunity."  <u>Aero Tech v. Great American</u>, No. CIV 22-0476 WJ/GFJ 2023 WL 5002618 at *4 (D.N.M. Aug. 3, 2023)(citing <u>Alltel Commc's, LLC v. DeJordy</u>, 675 F.3d 1100, 1103 (8th Cir. 2012)).  Magistrate Judge Fouratt concludes that a party seeking discovery from a nonparty federal employee or agency cannot compel discovery through a subpoena under Fed. R. Civ. P. rule 45, but rather must file a separate Administrative Procedure

Act, 5 U.S.C. § 706(2)(A), action to challenge the DOI's decision.  See Aero Tech v. Great American, No. CIV22-0476 WJ/GFJ 2023 WL 5002618 at *5.

    **4.**    **Aero Tech's separate APA lawsuit against the Interior Department.**

In response to Magistrate Judge Fouratt's order, Aero Tech now brings an APA action in a separate lawsuit against the Interior Department to compel discovery pursuant to the nonparty subpoena and Aero Tech's Touhy request.  As to the documents, Aero Tech seeks to compel the following: (i) all other modifications or amendments to the 2019 contract; and (ii) telephone records from the 2023 fire season, which Aero Tech believes are now available.  See Complaint ¶¶ 68-69, at 9.  As to the depositions, Aero Tech seeks to compel the Interior Department to allow oral, videotaped depositions.  Complaint ¶ 75, at 10.  Aero Tech alleges that the Interior Department's response allowing only written depositions violates the APA's arbitrary or capricious provision, 5 U.S.C. § 706(2)(A).  See Complaint ¶ 78, at 12; Petitioner's Reply Brief in Support of Its Petition for the Depositions of DOI to Proceed by Oral Examination Pursuant to F.R.C.P. 30 and for It to Produce Certain Amendments to a Contract with Petitioner and 2023 Phone Records at 6, filed June 18, 2024, (Doc. 25)("Reply").

    **a.**    **The Interior Department's Response.**

The Interior Department makes four arguments in response.  See Response Brief of the United States Department of the Interior, filed April 26, 2024 (Doc. 19)("Response").  First, the Interior Department argues that the Court must only review evidence in the AR and exclude Aero Tech's documents attached to its Motion, because they are not in the AR.  See Response at 18; Declaration of Nicole McMath, filed March 29, 2024 (Doc. 18-1); Declaration of Robert L. Lakind, Esq., filed March 29, 2024 (Doc. 18-2); Email from Great American's counsel to Aero

Tech's counsel re: Interior Department depositions, filed March 29, 2024 (Doc. 18-3); Email from Aero Tech's counsel to Interior Department re: subpoenas and <u>Touhy</u> request, filed March 29, 2024 (Doc. 18-4).  Second, the Interior Department argues that Aero Tech is not entitled to relief under 5 U.S.C. § 706(1), the APA provision that permits courts to "compel agency action unlawfully withheld or unreasonably delayed," because Aero Tech does not assert that the Interior Department fails to take a required discrete action.  <u>See</u> Response at 20 (citing <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004)).  Third, the Interior Department argues that the Court does not have subject matter jurisdiction for two reasons: (i) the APA does not apply when an agency's actions result from its "discretion by law," Response at 21; 5 U.S.C. § 701(a)(2)("This chapter applies, according to the provisions thereof, except to the extent that . . . agency action is committed to agency discretion by law."); and (ii) the Interior Department's <u>Touhy</u> regulations, which govern handling <u>Touhy</u> requests, do not create any "enforceable right or benefit against the United States."  43 C.F.R. § 2.280(f).  Fourth, the Interior Department argues that its response to Aero Tech's <u>Touhy</u> request does not violate the APA because it is not arbitrary, capricious, an abuse of discretion, or otherwise unlawful.  <u>See</u> Response at 23.

## **<u>LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION</u>**

Under the APA,

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or

injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. The APA empowers reviewing courts, "[t]o the extent necessary to decision and when presented," to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Such a reviewing court "shall":

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be --

> (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B)     contrary to constitutional right, power, privilege, or immunity;
>
> (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D)     without observance of procedure required by law;
>
> (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706. This statutory provision provides the "default standard" of review under the APA, which applies unless the agency's enabling act -- or another statute -- provides otherwise. See Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995)("[T]he APA provides a default

standard of judicial review -- arbitrary or capricious -- precisely for situations, such as this one, where a statute does not otherwise provide a standard of judicial review.").  Technically, § 706 provides standards -- not "a standard" -- of review, and different provisions in § 706 are used according to the subject of the review: for example, the arbitrary-and-capricious standard is used to review "[i]nformal agency action," and informal (notice and comment) rulemaking, City of Colorado Springs v. Solis, 589 F.3d 1121, 1131 (10th Cir. 2009), and that standard is "'very deferential' to the agency's determination," Kobach v. U.S. Election Assistance Comm'n, 772 F.3d 1183, 1197 (10th Cir. 2014)(quoting W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1273 (10th Cir. 2013)).  Section 706's substantial evidence test, on the other hand, "applies almost exclusively to formal adjudication," Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 745 F.2d 677, 686 n.6 (D.C. Cir. 1984)(Scalia, J.), because "a case subject to sections 556 and 557 of this title" refers to the formal adjudication and formal rulemaking provisions of the APA, 5 U.S.C. § 706(2)(E).  De novo review provided in 5 U.S.C. § 706(2)(F), the APA's least deferential standard of review, is limited to use in two instances: "(1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to enforce a nonadjudicatory action."  Franklin Sav. Ass'n v. Dir., Off. of Thrift Supervision, 934 F.2d 1127, 1142 n.7 (10th Cir. 1991)(emphasis in original)(citing Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).[1]  Importantly, § 706 also instructs the reviewing court, "[i]n making the foregoing

---

[1]In 1947, shortly after the passage of the APA, President Truman's Attorney General -- and future Associate Justice of the Supreme Court -- Tom Clark published the Attorney General's

determinations," to "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.

See Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1157 (10th Cir. 2004)(rejecting

the notion that the reviewing court's analysis "should be limited to those passages expressly relied

upon by the [agency]").

In the United States Court of Appeals for the Tenth Circuit, pursuant to Olenhouse v.

Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994)("Olenhouse"), "[r]eviews of

agency action in the district courts [under the APA] must be processed as appeals.  In such

circumstances the district court should govern itself by referring to the Federal Rules of Appellate

Procedure." Olenhouse, 42 F.3d at 1580 (emphasis in original).  See WildEarth Guardians v. U.S.

Forest Serv., 668 F. Supp. at 1323.  "As a group, the devices appellate courts normally use are

generally more consistent with the APA's judicial review scheme than the devices that trial courts

generally use, which presume nothing about the case's merits and divide burdens of proof and

---

Manual on the Administrative Procedure Act, which was prepared as a guide to the then-nascent
APA.  See United States Department of Justice, Tom C. Clark, Attorney General, Attorney
General's Manual on the Administrative Procedure Act (1947)("AG's Manual on the APA").
Therein, Attorney General Clark remarks -- contrary to the Supreme Court's later interpretation of
§ 706(2)(F) in Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. at 415 -- that "to the extent
that the facts are subject to trial de novo by the reviewing court," § 706(2)(F), "obviously refers
only to those existing situations in which judicial review has consisted of a trial de novo."  AG's
Manual on the APA at 109.  In essence, AG's Manual on the APA indicates that it was the Attorney
General's view -- in 1947 -- that § 706(2)(F) did not establish a standard by which courts could
apply the de novo standard of review to situations outside of those which existed at the time of the
APA's passage.  While this interpretation is not binding on any court, perhaps owing to its temporal
proximity to the passage of the APA, even the Supreme Court has acknowledged that "some
deference" should be afforded to the AG's Manual on the APA: "the Attorney General's Manual
on the Administrative Procedure Act 31, 35 (1947), a contemporaneous interpretation previously
given some deference by this Court because of the role played by the Department of Justice in
drafting the legislation, further confirms that view." Vermont Yankee Nuclear Power Corp. v. Nat.
Res. Def. Council, Inc., 435 U.S. 519, 546 (1978)(footnote removed).

production almost equally between the plaintiff and defendant." Northern New Mexicans Protecting Land and Water Rights v. United States, No. CIV 15-0559 JB/LF, 2015 WL 8329509 at *9 (D.N.M. Dec. 4, 2015)(Browning, J.).

1. **Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). The APA's two linguistic formulations amount to a single substantive standard of review. See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 683-84 (explaining that, as to factual findings, "there is no substantive difference between what [the arbitrary-or-capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)). See also id. at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness. The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found within the record of closed-record proceedings to which it exclusively applies." (emphasis in original)).

Again, in reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record. See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order

- 11 -

involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted."). See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had."). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing rule 201(b) of the Federal Rules of Evidence)("We take judicial notice of this document, which is included in the record before us in [another case]."); id. at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof."). In contrast, the Ninth and Eleventh Circuits -- as well as decisions from the United States District Court for the District of Columbia -- have held that taking judicial notice is generally inappropriate in APA review, subject to extraordinary circumstances or inadvertent omission from the administrative record. See Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010); National Min. Ass'n v. Sec'y U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016); Dist. Hosp. Partners, L.P. v. Sebelius, 971 F. Supp. 2d 15, 32 (D.D.C. 2013)(Huvelle, J.)("The Court, however, notes that taking judicial notice is typically an inadequate mechanism for a court to consider extra-record

evidence when reviewing an agency action."), aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46 (D.C. Cir. 2015). Broadly, the Tenth Circuit has expressed that "[w]hile judicial review of agency action is normally restricted to the administrative record, we have recognized that consideration of extra-record materials is appropriate in 'extremely limited' circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record." Lee v. U.S. Air Force, 354 F.3d 1229, 1242 (10th Cir. 2004)(quoting Am. Min. Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985)).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the whole record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971)). The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Env't Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999). Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Env't Coal. v. Dombeck, 185 F.3d at 1172. The agency must articulate the same

rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943)("the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately sustained."). While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

### 2.    Reviewing Agency Legal Interpretations.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution, and Courts reviewing those interpretations apply three different deference standards, depending on the law at issue. First, as it pertains to federal statutes, between 1984 and 2024, courts had to defer to agency interpretations of ambiguous statutes that the federal agency administered, and this deference was known as Chevron deference -- named after the 1984 case Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron"). Chevron deference was a two-step process[2] that first asked whether the statutory provision in question was clear and, if it was not, then asked whether the agency's interpretation of the unclear statute was reasonable. The Supreme Court, however, overturns this deferential approach during its October 2023 term in Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244, 603 U.S. ___ (2024)("Loper Bright").

---

[2]There was, additionally, a threshold step -- which Professor Cass Sunstein famously called "step zero" -- which asked whether Chevron deference applies to the agency decision at all. See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006).

In <u>Loper Bright</u>, in an opinion that the Honorable John Roberts, Chief Justice of the United States, authors, the Supreme Court reviews the traditional understandings of the judicial function, quoting Alexander Hamilton for the proposition that "[t]he Framers . . . envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts,'" <u>Loper Bright</u>, 144 S. Ct. at 2257 (quoting <u>The Federalist no. 78</u> (Hamilton)), and the Honorable John Marshall, former Chief Justice of the United States, for the oft-cited principle that "'[i]t is emphatically the province and duty of the judicial department to say what the law is,'" <u>Loper Bright</u>, 144 S. Ct. at 2257 (quoting <u>Marbury v. Madison</u>, 1 Cranch 137, 177 (1803)).  The Supreme Court describes that, although the New Deal "ushered in a 'rapid expansion of the administrative process,'" the Supreme Court continued to "adhere to the traditional understanding that questions of law were for courts to decide, exercising independent judgment."  <u>Loper Bright</u>, 144 S. Ct. at 2257 (quoting <u>United States v. Morton Salt Co.</u>, 338 U.S. 632, 644 (1950)).  The Supreme Court then reads and analyzes the plain language of the APA's Section 706 -- which states at the outset that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 -- and concludes that the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to <u>Marbury</u>: that courts decide legal questions by applying their own judgment."  <u>Loper Bright</u>, 144 S. Ct. at 2261.

The Supreme Court then explains that "[t]he deference that <u>Chevron</u> requires of courts reviewing agency action cannot be squared with the APA," <u>Loper Bright</u>, 144 S. Ct. at 2263, largely because "[t]he 'law of deference' . . . built on the foundation laid in <u>Chevron</u> [is]

'[h]eedless of the original design' of the APA," <u>Loper Bright</u>, 144 S. Ct. at 2265 (quoting <u>Perez v.</u>

<u>Mortg. Bankers Ass'n</u>, 575 U.S. 92, 109 (2015)(Scalia, J., concurring in the judgment)).

Moreover, according to the Supreme Court, "agencies have no special competence in resolving

statutory ambiguities.   Courts do."   <u>Loper Bright</u>, 144 S. Ct. at 2266.   In lieu of <u>Chevron</u>'s

presumption, the Supreme Court observes that "[t]he better presumption is . . . that Congress

expects courts to do their ordinary job of interpreting statutes, with due respect for the views of

the Executive Branch."   <u>Loper Bright</u>, 144 S. Ct. at 2267.   This, therefore, is what takes the place

of <u>Chevron</u> deference: ordinary judicial interpretation of statutes, and courts are free to review and

reject statutory interpretations that federal agencies offer.[3]

Second, despite the demise of <u>Chevron</u>, when agencies interpret their own regulations -- to,

for example, adjudicate whether a regulated party was in compliance with them -- courts accord

---

[3]The Supreme Court notes, however, that its holding does not forbid Congress from conferring some degree of statutory authority on agencies:

> That is not to say that Congress cannot or does not confer discretionary authority on agencies.  Congress may do so, subject to constitutional limits, and it often has.  But to stay out of discretionary policymaking left to the political branches, judges need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA.  By forcing courts to instead pretend that ambiguities are necessarily delegations, <u>Chevron</u> does not prevent judges from making policy.  It prevents them from judging.

<u>Loper Bright</u>, 144 S. Ct. at 2268.   In addition, <u>Loper Bright</u> affirms that <u>Skidmore</u> deference continues to apply.   <u>See Loper Bright</u>, 144 S. Ct. at 2262-63.   Under this species of deference, "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions."   <u>Loper Bright</u>, 144 S. Ct. at 2259 (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-40 (1944)).

agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452

(1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).  This deference is

applied in the same manner as the erstwhile Chevron deference and is substantively identical.

There would be little reason to have a separate name for this doctrine, except that its logical

underpinnings are much shakier, and its future is, accordingly, uncertain.  Justice Scalia, after years

of applying the doctrine followed by years of questioning its soundness, finally denounced Auer

deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S.

597 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the

doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." Talk America, Inc. v. Michigan Bell Telephone Co., [564] U.S. [50], 131 S. Ct. 2254, 2265 . . . (2011) (Scalia, J., concurring).  This is generally called Seminole Rock or Auer deference.
>
> . . . .
>
> The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for Auer to do.  In practice, Auer deference is Chevron deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading - - within the scope of the ambiguity that the regulation contains.
>
> Our cases have not put forward a persuasive justification for Auer deference. The first case to apply it, Seminole Rock, offered no justification whatever -- just the ipse dixit that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice

Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for Auer deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per Chevron, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of Chevron (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Montesquieu, Spirit of the Laws bk. XI, at 151-152 (O.

Piest ed., T. Nugent transl. 1949).  Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out by someone else.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be.  (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)  So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.   "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  1 Wm. Blackstone, <u>Commentaries on the Laws of England</u> 58 (1765).  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961).  <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power.

It is true enough that <u>Auer</u> deference has the same beneficial pragmatic effect as <u>Chevron</u> deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of <u>Chevron</u>-type deference has less severe pragmatic consequences for rules than for statutes.  In many cases, when an agency believes that its rule

- 19 -

permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 616-21 (Scalia, J., dissenting)(alterations in original)(citations omitted).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.[4]

Moreover, courts afford agencies no deference in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and Constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a Constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of Constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for Constitutional infirmities; they just should not defer to

[4]Clarence Thomas, Associate Justice of the Supreme Court, and Neil Gorsuch, Associate Justice of the Supreme Court, have recently echoed Justice Scalia's concerns with Auer deference and have called on the Supreme Court to reconsider and overrule Auer.  See Garco Construction, Inc. v. Speer, 138 S. Ct. 1052, 1052-53 (2018)(dissenting from denial of certiorari).

- 20 -

the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land

Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [Constitutional] due process

claim against the [agency] under the framework set forth in the APA.").

Last, the most recent development in Chevron-adjacent jurisprudence is the rise of the

"major questions doctrine."[5]   W. Virginia v. Env't Prot. Agency, 597 U.S. 697, 724

(2022)(Roberts, C.J.)("West Virginia v. EPA").  Concisely put, under this doctrine, a court should

not sustain an agency action that involves regulation of "major questions" -- those of great

"'economic and political significance,'" West Virginia v. EPA, 597 U.S. at 721 (quoting Food &

---

[5]The Court acknowledges that the novelty -- or, alternatively, the historical basis -- of this
doctrine is a source of debate, even among the Justices themselves.  Compare West. Virginia v.
EPA, 597 U.S. 697, 766 (2022)(Kagan, J., dissenting)(stating that the majority opinion "announces
the arrival of the 'major questions doctrine'" (quoting Majority Op. at 724)), with West Virginia
v. EPA, 597 U.S. at 740 (Gorsuch, J., concurring)("stating that "[s]ome version" of the major
questions doctrine "can be traced to at least 1897").  See Thomas W. Merrill, The Major Questions
Doctrine: Right Diagnosis, Wrong Remedy at 2, Hoover Inst., Legitimacy of Administrative Law
Essay   Series,   available   at   https://www.hoover.org/   sites/default/files/research/docs/
Merrill_WebReadyPDF.pdf (last visited July 27, 2024)(arguing that West Virginia v. EPA
crystalized previous expressions of skepticism about "agency assertions of 'broad and unusual
authority through an implicit delegation,'" into a distinct "doctrine"); Kevin O. Leske, Major
Questions About the "Major Questions" Doctrine, 5 Mich. J. Env't & Admin. L. 479, 480
(2016)("After over a decade of hibernation, the United States Supreme Court has awoken the
'major questions' doctrine, which has re-emerged in an expanded form." (source of quoted
material not cited)).  Nevertheless, the Court feels comfortable saying that West Virginia v. EPA
marks the "rise" of the major questions doctrine, because that case is the first time that the Supreme
Court stated that it was applying something called the "major questions doctrine."  West Virginia
v. EPA, 597 U.S. at 724.  Justice Kavanaugh, when serving as a Judge on the United States Court
of Appeals for the District of Columbia Circuit, once referred to something called the "major rules
doctrine" -- which he defined by quoting Justice Scalia's observation that "[w]e expect Congress
to speak clearly if it wishes to assign to an agency decisions of vast economic and political
significance."  United States Telecom Ass'n v. Fed. Commc'ns Comm'n, 855 F.3d 381, 417 (D.C.
Cir. 2017)( Kavanaugh, J., dissenting)(quoting Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 324
(2014)).

Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 147 (2000)(O'Connor, J.)) -- unless the agency can point to clear authorization from Congress for such an action, see West Virginia v. EPA, 597 U.S. at 720-24.  Although the majority opinion in Supreme Court in West Virginia v. EPA never mentions the erstwhile Chevron doctrine, many academic commentators have conceptualized the major questions doctrine as a "exception" or "carve-out" to Chevron analysis.  See Merrill, The Major Questions Doctrine: Right Diagnosis, Wrong Remedy, supra, at 2 ("[T]he major questions doctrine should be seen as a carve-out from the Chevron doctrine, one that all six justices in the conservative majority could agree on as a partial corrective to some of the most frequently cited failings of the Chevron regime."); Mila Sohoni, The Major Questions Quartet, 136 Harv. L. Rev. 262, 263-64 (2022)(arguing that West Virginia v. EPA and its companion cases "unhitched the major questions exception from Chevron, which has been silently ousted from its position as the starting point for evaluating whether an agency can exert regulatory authority"); William N. Eskridge, Jr. et. al., Textualism's Defining Moment, 123 Colum. L. Rev. 1611, 1675 (2023)("Recently, the Major Questions Doctrine (MQD) has become a prominent textualist-favored, policy-based exception to Chevron[.]"); Daniel T. Deacon & Leah M. Litman, The New Major Questions Doctrine, 109 Va. L. Rev. 1009, 1020-21 (2023)("In a set of cases, the [Supreme] Court has suggested either that an issue should not be analyzed using the Chevron framework because Congress did not authorize agencies to resolve the issue due to its majorness, or that the Chevron analysis operates differently because the agency policy is a major one.").  While many questions remain about the application of the major questions doctrine, it is clear that -- at least for "major" questions -- an agency will be presumed to have no authority to act unless Congress has "clearly" conferred on that agency the authority to act,

regardless of <u>Chevron</u> deference.  <u>West Virginia v. EPA</u>, 597 U.S. at 716.

**3.     Waiving Sovereign Immunity.**

The APA waives sovereign immunity with respect to non-monetary claims.  <u>See</u> 5 U.S.C.

§ 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:

5 U.S.C. § 702.  Claims for money damages seek monetary relief "to <u>substitute</u> for a suffered loss."

<u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d 1290, 1298 (10th Cir.

2009)(emphasis in original).  Claims that do not seek monetary relief or that seek "specific

remedies that have the effect of compelling monetary relief" are not claims for monetary damages.

<u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1298.  To determine

whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and

assess the plaintiff's prime object or essential purpose; "[a] plaintiff's prime objective or essential

purpose is monetary unless the non-monetary relief sought has significant prospective effect or

considerable value apart from the claim for monetary relief."  <u>Normandy Apartments, Ltd. v. U.S.

Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1296 (quoting <u>Burkins v. United States</u>, 112 F.3d 444,

449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money

damages" does not apply, however, "if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The Tucker Act, 28 U.S.C. §§ 1346,

1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States."  28 U.S.C. § 1346(a)(2).  It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief.  See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated?  Second, does the Tucker Act expressly or impliedly forbid the relief that Normandy seeks, such that the APA's waiver does not apply?"  Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING RULE 45 SUBPOENAS

Rule 45 of the Federal Rules of Civil Procedure governs a federal district court's subpoena power, and rule 45 provides that a subpoena can be served in a number of places:

Subject to Rule 45(c)(3)(A)(ii), a subpoena may be served at any place:

> (A)    within the district of the issuing court;
>
> (B)    outside that district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection;
>
> (C)    within the state of the issuing court if a state statute or court rule allows service at that place of a subpoena issued by a state court of general jurisdiction sitting in the place specified for the deposition, hearing, trial, production, or inspection; or

> (D)     that the court authorizes on motion and for good cause, if a federal
>         statute so provides.

Fed. R. Civ. P. 45(b)(2).  Rule 45 requires a court to quash or modify a subpoena when certain

conditions occur:

> (A)     **When Required.**  On timely motion, the issuing court must quash or
>         modify a subpoena that:
>
> > (i)     fails to allow a reasonable time to comply;
> >
> > (ii)    requires a person who is neither a party nor a party's officer to travel
> >         more than 100 miles from where that person resides, is employed,
> >         or regularly transacts business in person -- except that, subject to
> >         Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial
> >         by traveling from any such place within the state where the trial is
> >         held;
> >
> > (iii)   requires disclosure of privileged or other protected matter, if no
> >         exception or waiver applies; or
> >
> > (iv)    subjects a person to undue burden.

Fed. R. Civ. P. 45(c)(3)(A).  "[E]ven if relevant, discovery is not permitted where no need is

shown, or compliance would be unduly burdensome, or where harm to the person from whom

discovery is sought outweighs the need of the person seeking discovery of the information."

Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2, 197 F.3d 922, 925 (8th

Cir. 1999).

## ANALYSIS

The Court concludes that the Interior Department's responses to Aero Tech's Touhy

request violate the APA's arbitrary-or-capricious provision, 5 U.S.C. § 706(2)(A).[6]  The Court

---

[6]Under rule 45 of the Federal Rules of Civil Procedure, a subpoena compels the attendance of witnesses and the production of documents so the court may have access to all available

- 25 -

information to determine the controversies before it.  See Fed. R. Civ. P. 45; 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2451, at 380 (3d ed. 2008).  Courts of Appeals conclude consistently that a subpoena served on a nonparty federal agency is an action against the United States and is subject to sovereign immunity.  See Alltell Commc'ns, LLC v. DeJordy, 675 F.3d 1100, 1104 (8th Cir. 2012); EPA v. Gen. Electric Co., 197 F.3d 592, 597-98 (2d. Cir. 1999)("[T]he enforcement of this subpoena duces tecum issued by General Electric to the EPA would compel the EPA to act and therefore is barred by sovereign immunity in the absence of a waiver."); COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 277 (4th Cir. 1999).  No Courts of Appeals have ruled differently.  These and more Courts of Appeals, further conclude that even so, the APA permits judicial review of nonparty federal agency responses to subpoenas.  See Alltell Commc'ns, LLC v. DeJordy, 675 F.3d at 1104 ("Concluding that a third-party subpoena is a 'suit' triggering the federal government's sovereign immunity is significant, but it does not give the Executive Branch a 'blank check' to ignore third-party subpoenas because the agency response may be judicially reviewed under the Administrative Procedure Act, 5 U.S.C. § 702.")(internal quotes have no citation); COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d at 277 ("The APA waives sovereign immunity and federal courts can order a nonparty federal agency to comply with a subpoena if the United States refuses production in an arbitrary, capricious, or otherwise unlawful manner." ).  Two Courts of Appeals explain that the APA waives sovereign immunity in such situations, because it waives sovereign immunity for all actions that seek "relief other than money damages," 5 U.S.C. § 702, which includes nonparty subpoenas.  In Exxon Shipping Co. v. U.S. Dept. of the Interior, 34 F.3d 774 (9th Cir. 1994), the United States argues that sovereign immunity bars a federal court from compelling federal officers to comply with a federal court subpoena.  See 34 F.3d at 778.  The Ninth Circuit states that this argument "would raise serious separation of powers questions" and that "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."  34 F.3d at 778 (citing United States v. Reynolds, 345 U.S. 1, 9-10 (1953)).  The Ninth Circuit then notes that, moreover, Congress waives the government's sovereign immunity for these actions, because they seek "relief other than money damages."  34 F.3d at 778-79, n. 9; see U.S.C. § 702.  See Linder v. Calero-Portacarrero, 251 F.3d 178, 180 (D.C. Cir. 2001)("Third-party subpoenas do not seek damages and so the court held that federal agencies must comply with Rule 45 subpoenas unless the district court, exercising its discretion under the protective provisions of Rules 45 and 26, relieves them of that obligation.").  No Court of Appeals has concluded differently.

Indeed, before Great American, no court also had concluded that a new APA suit is needed to compel discovery from a federal agency after concluding that APA review is available.  Courts, to the contrary, note practical issues with requiring a plaintiff file a separate and independent APA lawsuit.  In EPA v. General Electric, 197 F.3d 592, 593 (2d Cir. 1999), the district court determines that the EPA has sovereign immunity as a United States' agency from complying with a subpoena for document production, that the APA waives its sovereign immunity, and finally, that GE incorrectly moved to compel compliance, instead of filing an independent APA lawsuit.  See 197 F.3d at 593.  The Second Circuit remands to the district court for APA review, holding that 5 U.S.C. § 702 does not require that GE file a "separate and independent" lawsuit to seek judicial review of the EPA's refusal to comply.  197 F.3d at 599.  The Second Circuit explains that allowing

the district court to streamline APA review recognizes the APA's waiver of sovereign immunity, permits the use of subpoenas to compel discovery of the United States as a nonparty, and "promote[s] judicial economy by allowing the underlying litigation to advance without delay." 197 F.3d at 599.  The Second Circuit also looks to the APA's "[f]orm and venue of proceeding" provision, 5 U.S.C. § 703, which provides that "[e]xcept to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."  197 F.3d at 599 (citing 5 U.S.C. § 703).  The Second Circuit then explains:

> A separate action for judicial review to compel compliance with a third-party subpoena addressed to the government during an ongoing litigation would provide neither a prior nor an adequate opportunity for review.  A separate action would not be "prior to" but rather contemporaneous with the ongoing litigation.  Such an action would be inadequate because it would result in time-consuming additional litigation that would either render the resulting discovery moot for the original litigation or unnecessarily delay that action.  As previously noted, a separate action also does not provide the exclusive opportunity for judicial review.

United States EPA v. GE, 197 F.3d at 599.  The Ninth Circuit also has broached the matter of requiring a separate APA lawsuit in the footnotes of at least two cases: Exxon Shipping Co. v. United States Dep't of Interior, 34 F.3d 774 (9th Cir. 1994)("Exxon Shipping"), and In re Recalcitrant Witness Boeh, 25 F.3d 761 (9th Cir. 1994)("Boeh").  In Exxon Shipping, the Ninth Circuit concludes primarily that rules 26(c) and 45(c)(3) of the Federal Rules of Civil Procedure govern the agency's response to discovery requests at issue, but adds in a footnote that the APA's arbitrary-or-capricious provision, see 5 U.S.C. § 706(A)(2), allows for judicial review of the agency's response.  See 34 F.3d at 780, n.11.  The Ninth Circuit then qualifies its statement, noting "[h]owever, we acknowledge that collateral APA proceedings can be costly, time-consuming, inconvenient to litigants, and may 'effectively eviscerate[]' any right to the requested testimony." Exxon Shipping, 34 F.3d at 780, n. 11 (citing Boeh, 25 F.3d at 764, n.4 (Norris, J., dissenting)). In Boeh, the Ninth Circuit reviews a district court's holding of FBI agent Boeh in civil contempt for not complying with the plaintiffs' subpoena, after the Attorney General denied Boeh permission to testify.  See Boeh, 25 F.3d at 763.  The Ninth Circuit concludes that the plaintiffs "selected an improper method" to compel Boeh's testimony, and that they instead "might have succeeded" by bringing the Attorney General or the "designated 'proper Department official' into court," Boeh, 25 F.3d at 764 (internal quote has no citation).  The Ninth Circuit adds in a footnote that is similar to Exxon Shipping, that the plaintiffs could have filed a "separate action" challenging the Department of Justice's decision under the APA.  Boeh, 25 F.3d at 764, n.3.  The Honorable William A. Norris, Circuit Judge for the Ninth Circuit, dissents from the majority's suggestion, stating that filing a separate action is not

> an acceptable substitute to the time-honored means of obtaining a witness's testimony by serving him with a subpoena ad testifacandum, backed up by the

court's power of contempt.  If [the plaintiff] had a right to Boeh's testimony, he had
a right to obtain it when he needed it, while the trial was still going on.  Forcing
[the plaintiff] to file a separate mandamus action or a cumbersome APA suit in the
middle of his civil rights trial is so burdensome that it effectively eviscerates his
right to obtain Boeh's testimony.

25 F.3d at 770, n. 4.  Even there, however, the discussion whether the plaintiffs should file a
separate APA lawsuit is tangential to the main issue that Boeh is the improper defendant.  Overall,
none of these cases conclude that, when APA review of a federal agency's response to discovery
requests is available, plaintiffs must file a separate APA suit.  The Second Circuit, to the contrary,
concludes that 5 U.S.C. § 702 does not require a separate suit, and the Ninth Circuit discussion
suggests that that filing a separate suit is impracticable.  Further, numerous district courts follow
the Second Circuit's conclusion.  See Ceroni v. 4Front Engineered Solutions, Inc., 793 F. Supp.
2d 1268, 1277 (D. Col. 2011)(Boland, M.J.) ("[W]here as here there is an underlying federal action
and the subpoenas in dispute were issued in connection with that underlying action, the defendant
is not required to file a separate an ancillary APA lawsuit to resolve the discovery dispute.");
Barnett v. Illinois State Board of Elections, No. 02-C-2401, 2002 U.S. Dist. LEXIS 12908, 2002
WL 1560013, at *1 (N.D. Ill. July 2, 2002)(Reinhard, J.)("[A] motion to compel directed against
the [non-party] Department does the job of bringing the APA 'action,' 5 U.S.C. § 703, before the
court equally as well as, if not better than, a separate APA claim against the Department.").  One
case in the Tenth Circuit, Armstrong v. Arcanum Group, Inc., 250 F. Supp. 3d 802 (D. Colorado
2017)(Shaffer, M.J.), concludes that the "appropriate procedure" to challenge the Bureau of Land
Management's decision under its Touhy regulations is to file an APA lawsuit, but the court
concludes so by relying on a mischaracterization of the Tenth Circuit's holding in the unpublished
decision In re: CRIMINAL SUBPOENA Duces Tecum Served on FBI SA Ed Gray, 162 F.3d 1172
(Table) (10th Cir. 1998)("In re Gray").  See Armstrong v. Arcanum Group, Inc., 250 F. Supp. 3d
at 805-06.  In re Gray holds only that a state court cannot compel a subordinate federal employee
to comply with a subpoena if the employee's superior instructs him or her not to comply, and
suggests that the plaintiff "may" want to pursue an APA action in federal court. 162 F.3d at 1172.
In re Gray's analysis of a state court's jurisdiction to compel discovery, and the court's mere
suggestion of bringing the case to federal court via a separate APA lawsuit, does not support the
conclusion that a plaintiff seeking a federal court to compel discovery must file a separate APA
action.  The academic literature, additionally, has not concluded that a new APA lawsuit is
required.  At most, it generally notes that a separate action is available.  See Zoe Niesel, Terrible
Touhy: Navigating Judicial Review of an Agency's Response to Third-Party Subpoenas, 41
Cardozo L. Rev. 1499, 1535 (April 2020)("[T]he requesting party can file a collateral action
seeking review under the APA."); Daniel C. Taylor, Note: Taking Touhy Too Far: Why Is It
Improper for Federal Agencies to Unilaterally Convert Subpoenas into FOIA Requests, 99 Geo.
L.J. 1227, 1250 (noting that in contrast to the "simple statutory scheme" of the Freedom of
Information Act, "the remedy for an agency's noncompliance with a subpoena is considerably less
clear.  Courts generally agree that litigants can file a motion to compel agency compliance with a
subpoena. . . ."); Robert D. Peltz, Who Is this Guy Touhy, and What Am I Supposed To Be

first concludes as initial matters that it can consider only evidence in the AR, and that it has subject-matter jurisdiction over the Interior Department's actions in response to Touhy requests.  The Court next concludes that the Interior Department's decision not to produce documents, i.e., the contract amendments and the 2023 fire season telephone records, is arbitrary and capricious, because it does so inexplicably.  The Court finally concludes that the Interior Department's response allowing only a written deposition instead of an oral deposition is arbitrary and capricious, because the evidence does not support the Interior Department's rationale and the rationale even contradicts the evidence.  The Court remands both the document-production and the deposition matters to the Interior Department for reconsideration.

## I.    THE COURT CONSIDERS ONLY MATERIALS IN THE AR.

The parties dispute whether the Court can look at the Motion's attachments, which are outside of the AR.  See Response at 18; Reply at 4.  In reviewing agency action under the APA's arbitrary-and-capricious standard, the Court must not look at materials outside of the record.  See

---

Requesting?, 86 Fla. Bar J. 8, ¶¶ 23-27 (2012)(listing procedures courts have followed for judicial review of federal agency's action in response to discovery requests, e.g., a motion to quash a subpoena, see Moore v. Armour Pharmaceutical Co., 927 F.2d 1194, 1196 (11th Cir. 1991); a motion to compel under Fed. R. Civ. P. rule 45, see Watts v. SEC, 482 F.3d 501, 508 (D.C. Cir. 2007); and a motion to compel, which adequately brings an APA action, see Barnett v. Illinois State Board of Elections, 2002 WL 1560013 at *1).

The Court does not think the Tenth Circuit would go against other courts and require a separate APA lawsuit for discovery.  A party properly may seek to compel a nonparty agency to allow oral depositions, and the APA waives the nonparty agency's sovereign immunity from nonparty subpoenas, which are a form of relief other than money damages.  Without requiring a party to file a separate APA lawsuit, the Court can assess whether the nonparty agency refuses production in a way that violates the APA's arbitrary-or-capricious provision.  The Court therefore does not lack the authority to review the nonparty agency's response to a party's subpoenas, and a party need not file a separate APA action against the nonparty agency.

5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted.").  See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had.").  The Court, therefore, concludes that it reviews only the materials in the AR and not the attachments in the Motion that are outside of the AR.  The Tenth Circuit's holding that courts can consider extra-record materials in "extremely limited" circumstances "such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record," Lee v. U.S. Air Force, 354 F.3d at 1242 (quoting Am. Min. Cong. v. Thomas, 772 F.2d at 626), does not apply here.  The evidence in the AR alone is sufficient to conclude that the Interior Department's response allowing only written depositions and inadvertent failure not to produce documents violates the APA's arbitrary-or-capricious provision.

## II.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER THE INTERIOR DEPARTMENT'S ACTIONS PURSUANT TO ITS TOUHY REGULATIONS.

First, the Interior Department asserts that the APA does not apply to its Touhy request responses, because the APA does not apply to an "agency action [that] is committed to agency

discretion by law." 5 U.S.C. § 701(a)(2).  <u>See</u> Response at 22.  The federal "housekeeping" statute, 5 U.S.C. § 301 ("Housekeeping Statute"), authorizes federal agencies to promulgate regulations governing the conduct of the agency's employees, the distribution of its business, and the custody, use, and preservation of the agency's records, papers, and property.  <u>See</u> 5 U.S.C. § 301.  The Interior Department promulgates its <u>Touhy</u> regulations pursuant to the housekeeping statute.  43 C.F.R. § 2 (listing 5 U.S.C. 301 as an authority).  Despite following "general policy not to allow its employees to testify or produce Department records either upon request or by subpoena," 43 C.F.R. § 2.281(a), the Interior Department will consider allowing production if a person submits a request in writing.  <u>See</u> Response at 7; 43 C.F.R. § 2.281(a).  It considers the following criteria in reviewing a <u>Touhy</u> request:

> In deciding whether to grant your <u>Touhy</u> Request, the appropriate Department official will consider:
>
> (a)     Your ability to obtain the testimony or records from another source;
>
> (b)     The appropriateness of the employee testimony and record production under the relevant regulations of procedure and substantive law, including the [Freedom of Information Act, 5 U.S.C. 552] or the Privacy Act [of 1974, 5 U.S.C. 552a]; and
>
> (c)     Our ability to:
>
> > (1)     Conduct our official business unimpeded;
> >
> > (2)     Maintain impartiality in conducting our business;
> >
> > (3)     Minimize the possibility that we will become involved in issues that are not related to our mission or programs;
> >
> > (4)     Avoid spending public employee's time for private purposes;
> >
> > (5)     Avoid the negative cumulative effect of granting similar requests;

(6)     Ensure that privileged or protected matters remain confidential; and

(7)     Avoid undue burden on us.

43 C.F.R. § 2.288.  The Interior Department must authorize employees to testify or to produce records.  See Response at 7; 43 C.F.R. § 2.281(b).

The Supreme Court rejects the argument that the Housekeeping Statute is an "explicit grant of legislative authority" that is exempt from the APA.  Chrysler Corp. v. Brown, 441 U.S. 281, 310 (1979).  The Supreme Court distinguishes between "substantive rules" on one hand, and "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" on the other.  Chrysler Corp. v. Brown, 441 U.S. at 301-02.  "Substantive rules," according to the Attorney General's Manual on the Administrative Procedure Act (1947), are rules that "implement" the statute and thus have the "force and effect of law."  Chrysler Corp. v. Brown, 441 U.S. at n. 31 (citing Attorney General's Manual on the Administrative Procedure Act at 30 n.3 (1947)).  In contrast, the Housekeeping Statute "merely gives department heads authority to regulate within their departments" the process for reviewing requests for information.  Chrysler Corp. v. Brown, 441 U.S. at n. 41 (quoting H.R. Rep. No. 1461, 85th Cong., 2d Sess., 7 (1958)).  The Supreme Court also notes that the members of the House Special Subcommittee on Government Information unanimously agreed that the Housekeeping Statute originally provided for United States' "day-to-day office housekeeping," but, "through misuse it has become twisted into a claim of authority to withhold information."  Chrysler Corp. v. Brown, 441 U.S. § 310 n.41 (quoting H.R. Rep. No. 1461 at 12).  Congressional concern led to the 1958 amendment, which clarifies that the Housekeeping Statute "itself was not a substantive authority to withhold information."  Chrysler Corp. v. Brown, 441 U.S. at 299, fn. 29.  The amendment reads: "This

- 32 -

section does not authorize withholding information from the public or limiting the availability of records to the public."  5 U.S.C. § 301.   Other Courts of Appeals also conclude that the Housekeeping Statute and its resulting regulations "do not justify nondisclosure of their own force."  Harvey Aluminum, Inc. v. NLRB, 355 F.2d 749, 755 (9th Cir. 1964); Exxon Shipping Co. v. United States Dep't of Interior, 34 F.3d 774, 778 (9th Cir. 1994)("Thus, neither the statute's text, its legislative history, nor Supreme Court case law supports the government's argument that [the Housekeeping Statute] authorizes agency heads to withhold documents or testimony from federal courts."); Comm. for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 788, 793 (D.C.Cir.1971) (noting that 5 U.S.C. § 301 "does not confer a privilege.").  Numerous academic literatures are also consistent:

> Every commentator we are aware of who has addressed the issue has reached the same conclusion.  See 8 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 2019, at 165-66 (1970 & 1994 Supp.) (The 1958 amendment "has made it clear beyond doubt that the 'housekeeping' statute does not in itself create a privilege when no privilege would otherwise exist."); Gregory S. Coleman, Note, Touhy and the Housekeeping Privilege: Dead but not Buried?, 70 Tex. L. Rev. 685, 689 & n.20 (1992) ("The proposition for which Touhy is often cited -- that a government agency may withhold documents or testimony at its discretion - simply is not good law and hasn't been since 1958."); Robert R. Kiesel, Note, Every Man's Evidence and the Ivory Tower Agencies: How May a Civil Litigant Obtain Testimony From an Employee of a Nonparty Federal Agency?, 59 Geo. Wash. L. Rev. 1647, 1656 (1991) (after the 1958 amendment "the Housekeeping Statute does not authorize nondisclosure regulations"); Don Lively, Government Housekeeping Authority: Bureaucratic Privileges Without a Bureaucratic Privilege, 16 Harv. C.R.-C.L. L. Rev. 495, 500 (1981) ("As the legislative history accompanying the 1958 amendment to the housekeeping statute shows, Congress intended that the statute itself should not double as a form of privilege.").

Exxon Shipping, 34 F.3d at 778, n.6.  Here, the Housekeeping Statute does not have the "force and effect of law" to bar from APA review the Interior Department's responses to Touhy requests.

Because the Interior Department's <u>Touhy</u> regulations are not "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and because the Housekeeping Statute does not authorize agencies from withholding information to the public, the Court, therefore, concludes that it has subject-matter jurisdiction over the Interior Department's response to Aero Tech's <u>Touhy</u> request.

## III.   THE INTERIOR DEPARTMENT'S RESPONSE ONLY ALLOWING WRITTEN DEPOSITIONS IS ARBITRARY AND CAPRICIOUS.

The Court, next, evaluates whether the Interior Department's response allowing only written depositions is arbitrary or capricious under the APA, 5 U.S.C. § 706(2).  <u>See</u> Reply at 6. The Tenth Circuit in <u>Colo. Env't Coal. v. Dombeck</u> notes that courts must "ensure that the agency decision was based on a consideration of the relevant factors" and "examine whether there has been a clear error of judgment."  185 F.3d at 1167.  An agency decision is arbitrary or capricious

> if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Colo. Env't Coal. v. Dombeck</u>, 185 F.3d at 1167.

The Interior Department argues that its employees are too busy to conduct an oral deposition during fire season.  <u>See</u> Response at 23.  They allow only a written deposition under rule 31.  <u>See</u> Fed. R. Civ. P. Rule 31.  Rule 31 written depositions are a discovery tool to obtain testimony either from a party or from a nonparty witness, without incurring the expense of an oral deposition.  <u>See</u> Depositions by Written Questions, Moore's Federal Practice § 31.02 at 31-5 (3d ed. 2024)("Moore's").  All questions, including cross, redirect, and recross questions, are prepared in advance, and served on all the parties, and are delivered to a deposition officer who asks the

questions and records the deponent's responses.  See Moore's at 31-5.  Grant Beebe, the Assistant

Director of Fire and Aviation for the Bureau of Land Management, explains the business of fire

season, and how Angie Forbes and Angelina Clements "possess jobs that are critical to firefighting

efforts."  Beebe Decl. ¶¶ 10-11, at 2 (AR 0057).  Beebe concludes that "removing these employees

from their regular duties would be disruptive of mission critical work and would detract from their

ability to perform their work for BLM."  Beebe Decl. ¶ 14, at 3 (AR 0058).  Forbes worked a

"significant amount" of overtime hours throughout fire season, and Clements worked additional

hours as well.  Beebe Decl. ¶¶ 16-17, at 2 (AR 0058).  This argument, however, fails for two

reasons: evidence in the AR indicates the Interior Department has the capacity to comply to the

subpoenas, and written depositions are impracticable in this case.  First, the Interior Department

evaluates each of the Touhy regulations factors and overall finds that the factors warrant

compliance with the Touhy request.  See Touhy Evaluation Worksheet, (dated April 10, 2023),

lodged February 23, 2024 (AR 0042-45).  The review notes the following:

**8. [sic] Touhy Regs Section c. Factors**

(1)     Aero Tech does not see how or believe the subpoenas impede on DOI's
ability to conduct its business,

*It's certainly time away that could be used on priority mission work, and
timing is heading right into fire season.  However, are there any stronger
arguments that would justify not being able to accomplish work?*

No objection to this factor.

. . . .

(4)     Aero Tech does not see how or believe the subpoenas result in any public
employee spending a significant amount [sic] time for private purposes, [sic]

> *Similar to section 8. Number 1. I know we've already spent time circling this issue, but how much time do you estimate it will take to produce the requested documents and prepared for a deposition?*

> No objection to this factor if they will agree to deposition upon written question.

Touhy Evaluation Worksheet at 3 (AR 0044).  The evidence shows that the Interior Department does not object to the amount of time it would take to respond to subpoenas, and does not object specifically to the amount of time it would take to conduct a written deposition.

Second, the Interior Department does not explain why a written deposition makes more sense here than an oral deposition, nor would it be able to.  Written depositions have inherent limitations, which are evident here.  Written depositions are time consuming because objections, attempts to clarify witness testimony, and authentication of documents may take longer to resolve.  The AR reflects that Aero Tech and Great American communicated to the Interior Department their concerns with these inefficiencies:

> [T]here would be written questions provided to the DOI, DOI would then provide written answers, then based on those answers there would be another round of written questions to DOI to which DOI would then again provide written answers, and then finally there would be a deposition where the written answers are read into the record.  Basically it would be a lot of interrogatories for DOI.  Additionally, then [sic] since this would not proceed in a manner as a normal deposition, [Great American] points out there would need to be a procedure for asserting objections.  That would have to be done in writing.  That all seems like it would be fairly complicated.  Further with what [Great American] is proposing it seems like there would be a lot of back and forth just on objections alone.  Further, [Great American] indicated that it may also want to prepare a list of additional documents to request from DOI.

See Email from Robert Lakind to Mel M. Meier at 3, (dated Friday, April 14, 2023), lodged February 23, 2024 (AR 0037).  No evidence in the record shows that the Interior Department provides a competent response to these concerns about a written deposition.  Nor could there be:

rule 31 written depositions are practically unheard of for many of the noted reasons. "Depositions by written questions under Rule 31 are rarely, if ever, used in modern litigation under any circumstances," and "they present huge disadvantages." Pueblo of Jemez v. United States, No. CIV 13-2181, 2017 WL 6512230 at *2 (D.N.M. Dec. 19, 2017)(Ritter, M.J.). Various other courts have noted the disadvantages of written depositions. See Ali v. Gilead Science, Inc., No. 18-cv-00677 LHK (SVK), 2018 U.S. Dist. LEXIS 128391, at *3 (N.D. Cal. 2018)(Van Keulen, M.J.)("[O]ral depositions have several advantages over written depositions, including the opportunity for follow-up questions."); Scott v. Chipotle Mexican Grill, Inc., 306 F.R.D. 120, 125 (S.D.N.Y. 2015)(Netburn, M.J.)(noting that written questions are rarely an adequate substitute for an oral deposition, because it is difficult to pose follow-up questions, and spontaneity of direct examination is lacking because of attorney involvement); Mill Run Tours, Inc. v. Khashoggi, 124 F.R.D. 547, 549 (S.D.N.Y 1989)(Francis IV, M.J.)(noting that written depositions should not routinely replace oral depositions). At the hearing, the Court notes the unusual nature of written depositions, stating that "[i]t's almost like the agency went to a broom closet and found a tool that's never used." Tr. at 27: 17-19 (Court). The Interior Department even agrees with the Court that "nobody uses these," Tr. at 27:19-20 (Court, Kelly), and further states that she has never "participated or seen or been involved in or sat through or been a party involved" in a rule 31 written deposition. Tr. at 28:4-7 (Kelly). The Interior Department's twenty-five question limit itself is arbitrary, given that rule 31 does not establish any limit on the number of questions, unlike written interrogatories. See Fed. R. Civ. P. rule 31. Nor does the Interior Department consider the likelihood of cross-questions and re-cross questions, follow-up questions, and questions by other parties in Great American. The timing of a written deposition is as follows: within 14 days

of first serving the deponent questions and notice on the parties, another party may serve cross questions.  See Moore's at 31-19.  Within seven days of serving cross-questions, the noticing party may serve redirect questions, and within another seven days, a non-noticing party may serve recross questions.  See Moore's at 31-19.  While the court can adjust the timing of these stages, the total time involved is at least 28 days.  See Moore's at 31-19-20.  Overall, a written deposition under standard rule 31 procedure may even be more time consuming and more burdensome than oral depositions.  By not explaining why a written deposition would take less time or be less burdensome here than an oral deposition, the Interior Department's explanation -- or rather, assumption -- contradicts the evidence and practical wisdom that suggests otherwise.  The Court concludes that the Interior Department's response only allowing written depositions contradicts the evidence, and that no evidence supports the Interior Department's response.  Therefore, the Interior Department's response is arbitrary and capricious.

The Court does not agree with, however, Aero Tech's arguments that the Interior Department's response is arbitrary or capricious because it could conduct oral depositions after fire season, and because the depositions only would take three hours each.  See Motion at 8-9. Neither of these considerations are in the AR.  Aero Tech's subpoena sets the deposition for April 21, 2023 at 10:00 a.m.  See Subpoena to Testify at a Deposition in a Civil Action (dated April 3, 2023), lodged February 23, 2024 (AR 0010).  The subpoena, however, does not set an end date or time.  Nor does any evidence in the record show that Aero Tech communicates to the Interior Department afterwards that the depositions would take only three hours each.  The Court still concludes, nevertheless, that the Interior Department's response allowing only written depositions is arbitrary and capricious given the evidence in the record that conflicts with its justification, and

its failure to consider how time consuming and burdensome written depositions are.  The Interior

Department's insistence on a written deposition as opposed to an oral one, when all parties and the

Court agree that it is almost never used, is "so implausible" that it cannot be because of a

"difference in view" or a "product of agency expertise."  <u>Colo. Env't Coal. v. Dombeck</u>, 185 F.3d

at 1167.  The Court, therefore, concludes that the Interior Department's response allowing only a

written deposition violates the APA's arbitrary-or-capricious provision, 5 U.S.C. § 706(2).

## IV.  THE INTERIOR DEPARTMENT'S FAILURE TO PRODUCE DOCUMENTS IS <u>ARBITRARY AND CAPRICIOUS</u>.

On April 27, 2023, the Interior Department responds to Aero Tech's <u>Touhy</u> request

agreeing to produce "contract documents and phone record[s]."  Letter from Interior Department

to Robert Lakind re: <u>Touhy</u> request at 2 (AR 0054).  At the hearing, the Interior Department even

concedes that it agreed to produce all <u>Touhy</u> requested documents, <u>see</u> Tr. at 21:4-5 (Kelly), and

affirms no opposition to document production as "[t]hey've been authorized for production under

the <u>Touhy</u> decision."  Tr. at 39:15-16 (Kelly).  The Interior Department's <u>Touhy</u> regulations also

provide that it "will authenticate a copy of Department records on request."  Legal Process:

Testimony of Employees and Production of Records, 65 Fed. Reg. 46, 366 (July 28, 2000).  The

Interior Department chalks up its failure to produce documents as a simple "inadvertent" error, but

the evidence does not support this claim.  Tr. at 21:4-5 (Kelly)(noting that some documents "may

have been inadvertently not produced.")  On two separate occasions after the Interior Department

agreed to document production, Aero Tech flags the missing documents: once four months later,

<u>see</u> Complaint ¶ 2, at 1, and again fourteen months later, <u>see</u> Motion at 11.  No evidence shows

good reason for withholding the documents upon Aero Tech's repeated attempts to obtain them.

The Interior Department to this day -- a year and a half after the initial agreement -- still has not produced the amendments to the 2019 contract and the 2023 fire season telephone records.  The Interior Department's failure to produce documents contradicts its own agreement to do so, contradicts the regulation requirements, and ultimately reflects a "clear error of judgment."  Colo. Env't Coal. v. Dombeck, 185 F.3d at 1167.

The Interior Department argues that, as to the Touhy request documents, Aero Tech should contact the Interior Department to inquire about the status of the document production.  See Response at 28.  There is no sound basis for this argument, because the Interior Department does not cite any authority regarding its procedure post-Touhy request approval, much less one that requires Aero Tech to contact the Interior Department as opposed to filing this suit.  Furthermore, Aero Tech is correct that it cannot contact the Interior Department directly, because counsel represents the Interior Department.  See Motion at 11.  The Court, therefore, concludes that the Interior Department's inexplicable withholding of the agreed upon documents is arbitrary and capricious.  The Court orders the Interior Department to produce the 2019 contract amendment and the 2023 fire season telephone records within ten days of the entry of this opinion.

## V.     THE COURT COMPELS BOTH ORAL DEPOSITION AND DOCUMENT PRODUCTION.

The Court shall compel agency action when it is "unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The Court shall hold unlawful and set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  Although Aero Tech states that it does not pursue relief under 5 U.S.C. § 706(1), see Reply at 6, its Motion indicates otherwise; Aero Tech moves for the Court to compel

- 40 -

discovery, see Motion at 11 ("For the above reasons, this Court should (1) order the DOI depositions to proceed orally and (2) order DOI to produce the 2023 phone records and contract amendments that are dated after June 15, 2021.").   When an agency withholds discovery in violation of the APA's arbitrary-or-capricious provision, see 5 U.S.C. § 706(2)(A), courts then may compel the withheld discovery under the preceding "unlawfully withheld or unreasonably delayed" provision, 5 U.S.C. § 706(1).   An "arbitrary and capricious" action is one that is "unlawful" within the meaning of section 706(1), and that when an agency arbitrarily or capriciously withholds action, we may "compel" the agency to act under this section.   Hondros v. United States Civil Service Com., 720 F.2d 278, 297 (3d Cir. 1983).   "Accordingly, section 706(1) authorizes injunctive relief to compel an appointment arbitrarily or capriciously withheld." Hondros v. United States Civil Service Com., 720 F.2d at 297-298.

The Court, first, concludes that the Interior Department's actions are unlawful under the APA's arbitrary-or-capricious provision, 5 U.S.C. § 706(2)(A), because both of its actions -- allowing only a written deposition and inexplicably withholding document production -- contravene the evidence and lack sound rationale.   Second, because the Interior Department's failure to produce the requested discovery is unlawful under 5 U.S.C. § 706(2)(A), it also constitutes an agency action unlawfully withheld under 5 U.S.C. § 706(1).   The Court, pursuant to 5 U.S.C. § 706(1), compels the Interior Department to produce the requested discovery.

**IT IS ORDERED** that: (i) the Plaintiff's Brief to In Support of Its Petition for the Depositions of the Department of Interior to Proceed by Oral Examination Pursuant to F.R.C.P. 30 and for it to Produce Certain Amendments to a Contract with Petitioner and 2023 Phone Records, filed March 29, 2024 (Doc. 18), is granted; (ii) the United States Interior Department's

response to Plaintiff Aero Tech, Inc.'s <u>Touhy</u> request is vacated; (iii) the Interior Department must

allow oral depositions of Angie Forbes and Angeline Clements; (iv) the Interior Department must

produce all amendments and modifications to the 2019 contract within ten days of entry of this

opinion; (v) the Interior Department must produce the 2023 telephone records within ten days of

entry of this opinion; and (vi) the Court will enter a separate Final Judgment disposing of this civil

case.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Robert L. Lakind
Szaferman, Lakind, Blumstein & Blader, P.C.
Lawerenceville, New Jersey

      *Attorney for the Plaintiff*

Alexander M.M. Uballez
  United States Attorney
Samantha E. Kelly
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Defendant*